IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH A. AMES,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN RADIO RELAY LEAGUE INCORPORATED, et al.,<br><br>Defendants. | CIVIL ACTION<br>NO. 16-03660 |

**Jones, II J.** **December 21, 2016**

**MEMORANDUM**

This case involves a state-law defamation claim brought by Joseph Ames, a citizen of Pennsylvania, against American Radio Relay League Incorporated (ARRL), a Connecticut corporation, and Tom Gallagher, Rick Roderick, and Dr. James Boehner (each an out-of-state officer or director of ARRL, and together with ARRL, the "Defendants").[1] Compl. ¶¶ 1, 8-11, ECF No. 1.

Pending before this Court is Defendants' Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). Defs.' Mot. Dismiss, ECF No. 10. This Court grants the Motion because the plaintiff's pleadings, including documents referenced therein and submitted by the parties, show on their face that the allegedly defamatory statements are true and, thus, cannot form the basis of a defamation claim as a matter of law.

[1] This Court has subject matter jurisdiction over Ames' Complaint on the basis of diversity jurisdiction, 28 U.S.C. § 1332. The parties are completely diverse, Compl. ¶¶ 8–9, and Ames is seeking damages in excess of $75,000, *see id.* at 13. Defendants do not dispute jurisdiction.

**<u>STANDARD OF REVIEW</u>**

In deciding a 12(b)(6) motion, courts must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This standard, which applies to all civil cases, "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "[A]ll civil complaints must now set out sufficient factual matter to show that the claim is facially plausible." *Fowler*, 578 F.3d at 210 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

"As a general rule, the court may only consider the pleading which is attacked by an FRCP 12(b)(6) motion in determining its sufficiency." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (quoting 62 FED. PROC., LAWYERS' EDITION § 62:508). "However, the court may consider documents which are *attached* to or submitted with the complaint, as well as . . . documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading[.]" *Id.* (emphasis in original). "Documents that the defendant attaches to the motion to dismiss *are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim*[.]" *Id.* (emphasis in original).

**BACKGROUND**

Defendant ARRL is the national association for Amateur Radio in the United States.  Compl. ¶ 1, n.1.  It is a non-profit organization that organizes and trains volunteer amateur radio operators to provide public service and emergency communication.  *See About ARRL*, http://www.arrl.org/about-arrl (cited in the Complaint at ¶ 1, n.1); *see also* Defs.' Br. 2, ECF No. 10-2.  ARRL is governed by a 15-member board of directors, each elected regionally by division.  *See ARRL Organization Structure*, http://www.arrl.org/organization-structure; *see also* Defs.' Br. 2.  Each division is further divided into sections, each of which periodically elects a section manager.  Section managers are responsible for administering ARRL's volunteer field organization programs.  *See The ARRL Field Organization Structure*, http://www.arrl.org/field-organization; *see also* Defs.' Br. 2-3.

The National Traffic System ("NTS") is one of ARRL's public-service field organization programs.  Compl. ¶ 1, n.1.  The NTS is divided into three areas: Eastern, Central and Pacific.  *Id*.  Plaintiff Ames does not explicitly allege his relationship to AARL, but the Complaint presumes he is a volunteer member who served as Eastern Pennsylvania section manager and NTS Eastern Area chair.  *Id*. ¶ 1.

During his tenure as section manager and area chair, Ames engaged in direct communications with representatives of the Federal Emergency Management Agency (FEMA).  *Id*. ¶¶ 19-20, 23-25, 31-35, *and* Exs. A, F, G, and H.  On or around June 20, 2016, ARRL sent Ames a letter informing him that he was being removed from his leadership roles for communicating directly with FEMA and making commitments on behalf of NTS and ARRL without authorization and in violation of ARRL's policies.  Compl. ¶ 15 and Ex. K.  On June 22,

ARRL published an article on its website announcing Ames' termination and the reasons therefor (the "Article"). Compl. ¶ 15, Ex. B. The Article states, in relevant part:

> Ames unilaterally and repeatedly communicated with officials of the Federal Emergency Management Agency (FEMA) on behalf of NTS, making commitments on behalf of ARRL without authority and in violation of the rules and regulations of the Field Organization. Those actions were contrary to the terms of the *Memorandum of Understanding* between FEMA and ARRL, which states clearly that ARRL Headquarters staff will be the single point of contact between FEMA and ARRL. . . .
>
> In August 2015, then-ARRL CEO David Sumner . . . wrote to Ames and instructed him that, unless otherwise authorized by ARRL, any communication with FEMA with respect to NTS is to be conducted through ARRL authorized representatives. ARRL learned that Ames repeatedly acted contrary to Sumner's directive, which led to the decision to cancel Ames's Field Organization appointment and to declare the office of the Section Manager for Eastern Pennsylvania vacant.

*Id*. ¶ 16, Ex. B (emphasis in original).

The content of the Article was later reported on the ARRL audio news broadcast, and was distributed via e-mail to global subscribers of "The ARRL Letter," as well as through the ARRL Special Bulletin ARLX007 and ARRL social media outlets. *Id*. ¶ 17. Third party media outlets, such as Amateur Radio Newsline, also reported the Article's news on numerous radio stations. *Id*. The plaintiff alleges that, as result of these publications, "many" of ARRL's 165,000 members worldwide and other third parties saw and/or heard about the Article. *Id*. ¶ 42.

Ames filed the present Complaint on July 5, 2016, alleging that the Article defamed him, harmed his reputation and caused him emotional anguish. *Id*. ¶¶ 42-52. Specifically, he claims that the following statements are false and defamatory: (1) Ames unilaterally communicated with FEMA officials on behalf of NTS; (2) Ames repeatedly acted contrary to a letter ARRL's chief executive officer sent Ames in August 2015, which stated that any communications from NTS to FEMA were to be conducted only through an authorized

ARRL representative; and (3) Ames made commitments on behalf of ARRL without authority and in violation of ARRL's rules and regulations and the terms of the Memorandum of Understanding between FEMA and ARRL. Compl. ¶¶ 18, 22–23, 30–31, 44–46. The Complaint references several exhibits attached thereto, including copies of the publications that gave rise to this dispute and various e-mails and letters that purport to establish the falsity of the defamatory statements. Compl., Exs. A-K.

Defendants moved to dismiss the Complaint for failure to state a claim. Attached to Defendants' Motion is a document referenced in, but not filed with, the Complaint. *See* Defs.' Br., Ex. A. The Court may consider all the documents submitted by the parties and referenced in the plaintiff's pleadings in deciding a Rule 12(b)(6) motion.[2] *See Pryor*, 288 F.3d at 560.

**DISCUSSION**

This Court grants Defendant's Motion to Dismiss because the plaintiff's pleadings show on their face that the contested statements are true and, therefore, cannot form the basis of a defamation claim under Pennsylvania law.[3]

To state a *prima facie* case for defamation, the plaintiff must show: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its

[2] The plaintiff argues that Defendants cannot "draw from facts outside the Complaint." Pl's Br. 10, ECF No. 12. He also suggests—without citing any authority—that this Court is not permitted to reference the exhibits attached to his Complaint for purposes of deciding the Motion to Dismiss. *Id*. at 3, 11–13. The plaintiff is wrong to the extent Defendants and this Court rely on undisputed documents referenced in his Complaint. *See Pryor*, 288 F.3d at 560. Moreover, the plaintiff contradicts himself by arguing that the contents of "the exhibits attached to the Complaint" show that the statements in the Article are false. Pl's Br. 4.

[3] The present case does not appear to implicate any conflict of laws as none of the parties' challenge the applicability of Pennsylvania law. *See Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 269–70 (3d Cir. 1980) (courts can apply the law of a particular state if the litigants agree to have that state's law govern their dispute's substantive issues, and that state has an interest in the outcome of their case). But even if such a conflict existed, Pennsylvania has the greatest interest in this case because the plaintiff is domiciled here. *See Wilson v. Slatalla*, 970 F. Supp. 405, 414 (E.D. Pa. 1997) ("the state of plaintiff's domicile generally has the greatest concern in vindicating plaintiff's good name and providing compensation for harm caused by the defamatory publication," quoting *Fitzpatrick v. Milky Way Prods., Inc.*, 537 F. Supp. 165, 171 (E.D. Pa. 1982) (internal quotation marks omitted)). The viability of Ames' defamation claim is, therefore, governed by Pennsylvania law.

application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. 42 Pa. Stat. and Cons. Stat. Ann. § 8343(a).

"Truth is an affirmative defense [to defamation claims brought] under Pennsylvania law." *Tucker v. Fischbein*, 237 F.3d 275, 287 (3d Cir. 2001) (citing 42 Pa. Stat. and Cons. Stat. Ann. § 8343(b)(1)); *see also Bobb v. Kraybill*, 511 A.2d 1379, 1380 (Pa. Super. Ct. 1986) ("Truth is an absolute defense to defamation in Pennsylvania"). Accordingly, to be actionable, the alleged defamatory statements must be false. *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 334 (Pa. Super. Ct. 2008)); *see also Kurowski v. Burroughs*, 994 A.2d 611, 619 (2010) ("it is a constitutional requirement that a plaintiff alleging defamation bear the burden of demonstrating that the statements are false," citing to *Phila. Newspapers v. Hepps*, 475 U.S. 767, 776 (1986)); *Tucker*, 237 F.3d at 288 (Alito, J.) (a defendant accused of making defamatory comments "cannot be held liable unless the [plaintiff] can prove that the comments were false").

Courts do not ordinarily consider affirmative defenses on a motion to dismiss unless "they appear on the face of the complaint." *Morrison v. Chatham Univ.*, No. CV 16-476, 2016 WL 4701460, at *4 (W.D. Pa. Sept. 8, 2016) (citing to *Ball v. Famiglio*, 726 F.3d 448, 461 (3d Cir. 2013), which held that 12(b)(6) dismissal on the basis of an affirmative defense is appropriate where the defense appears on the face of the complaint). Hence, a defendant can defeat a defamation claim with a 12(b)(6) motion if the plaintiff's pleadings demonstrate on their face that the defamatory communications are true. *Whiting v. Safe Auto Insurance Co.*, No. 15-6791, 2016 WL 3940827, at *4 (E.D. Pa. July 20, 2016) (dismissing a defamation claim pursuant to Rule 12(b)(6) because the factual allegations in the complaint, taken as true, "in no way

undermine[d] the truth of" the defendant's statement); *Morrison*, 2016 WL 4701460, at *4 (dismissing defamation claim pursuant to Rule 12(b)(6) "because the face of Plaintiff's Amended Complaint makes clear the truth of the defamatory statements.").

Here, the plaintiff's own pleadings, including documents referenced in the Complaint and submitted by the parties, demonstrate that all three contested statements are true. First, Ames communicated with FEMA representatives on behalf of NTS and did so unilaterally, i.e., without ARRL's agreement. On May 28, 2015, Ames received an e-mail from Christopher Turner, deputy director of FEMA's Disaster Emergency Communications Division. Compl. ¶ 24, Ex. H 2. Within hours, Ames responded directly to Turner's inquiries and did so in his capacity as section manager and NTS Eastern Area chair as indicated by his e-mail's signature block. *See* Compl. ¶ 25, Ex. H 1-2. Then, on July 10, 2015, Ames signed a letter addressed to Eric Edwards, another FEMA representative. Compl., Ex. A. That letter was drafted on NTS letterhead and was apparently co-signed by James Wades, an NTS director. *Id*. There is no allegation that Ames or Wades was authorized to communicate with FEMA on NTS' behalf.

On the contrary, in August 2015, ARRL's then-chief executive officer David Sumner sent Ames a letter notifying him that his communications with FEMA, including the July 10 letter signed by Ames and Wades, were unauthorized and violated ARRL policy. Defs.' Br., Ex. A 1-2; *see also* Compl. ¶ 32. Sumner's letter specifically references "Bylaw 31," which purportedly reads in relevant part:

> The President . . . shall, subject to instructions from the Board of Directors, and with the assistance of the Chief Executive Officer, represent the League in its relationships with the public and the various governments, governmental agencies and officials with which the League may be concerned, and shall be the official spokesman of the Board of Directors in regard to all matters of League policy.

Defs.' Br., Ex. A. The letter also alludes to "Board policy," which supposedly includes the following guidance:

> The Chief Executive Officer is responsible to the President for contacts made by staff, including the Regulatory Information Manager and the Chief Technology Officer, in the performance of their duties. From time to time, assignments involving Federal government contact may be made by the Board to individuals or to ad hoc Committees, task groups or task forces; in such cases, the extent of contact authorized will be determined by the terms of reference.

*Id*. Sumner proceeded to explain that Michael Corey was the only ARRL representative authorized to communicate with FEMA under a Memorandum of Agreement between the two entities, and that moving forward "any communication with FEMA pertaining to the [NTS] and any other ARRL program [was] to be conducted only through Mr. Corey" unless otherwise authorized by ARRL's then-President Kay Craigie. Defs' Br., Ex. A 2. Ames does not question the authenticity of this letter or the veracity of its content.

Second, Ames admittedly continued to communicate with FEMA even after receiving Sumner's letter. Compl. ¶¶ 19-20, 32. For instance, on October 10, 2015, Ames notified Sumner and Corey that he had received a call from Turner regarding Hurricane Joachim and, "given the sense of urgency in his voice," Ames confirmed to Turner that NTS was willing to help. Compl. ¶ 19, Ex. F. On or around February 12, 2016, Ames once again wrote an e-mail to Turner "[o]n behalf of the NTS and ARRL[.]" Compl. ¶ 20, Ex. G. In that e-mail, Ames noted that Corey was the "organizational point of contact for FEMA," but stated that he would be "happy to continue as your NTS liaison if you so desire." *Id*. Ames does not allege Craigie authorized those communications. Thus, it is true that Ames unilaterally communicated with FEMA on behalf of NTS before and after Sumner's August 2015 letter.

Third, Ames made unauthorized commitments on behalf of ARRL in violation of the organization's rules and regulations and the terms of its Memorandum of Understanding with FEMA. In the July 10, 2015 letter to Edwards, Ames and Wades stated that NTS "desire[d] to build on the foundation established by the memorandum of agreement[.]" Compl., Ex. A. That letter also stated that "NTS will work with FEMA to develop standard guidelines to define the extent and nature of [NTS'] support to FEMA, as well as state and local emergency management agencies." *Id.* Ames and Wades further committed NTS to arranging a "table top exercise" with Edwards' FEMA team and went so far as to "envision a formal memorandum of agreement or understanding between NTS and FEMA" separate and apart from the existing Memorandum of Agreement between ARRL and FEMA. *Id.* Finally, they claimed that the "entire NTS . . . look[ed] forward to continuing [the] discussion." *Id.* Ames made various other commitments in an e-mail he sent to Turner on February 11, 2016. Compl., Ex. G 2. Ames stated that "NTS [was] delighted to accept FEMA's invitation to participate in the upcoming exercise, *Cascadia Rising*," and he specifically committed several NTS representatives to support the FEMA exercise by outlining their roles.[4] *Id.* (emphasis in original). In sum, the plaintiff's own pleadings demonstrate that all three contested statements are true.

The plaintiff's arguments to the contrary do not pass muster. Ames does not dispute that his communications with FEMA actually happened as described. Instead, he argues that the Article "as a whole is false and defamatory because ARRL knew of and approved [his] conduct." Pl.'s Br. 15, ECF No. 12. He notes that he "looped in ARRL leadership and peers . . . throughout [his] ongoing dialogue with FEMA," and that Sumner and Corey each thanked him for keeping them informed of those conversations without expressing any disapproval. *Id.* at 6,

[4] Ames explained to Turner that "Rob Griffin, chairman of the NTS Pacific area staff and fellow ARRL section manager, will supervise NTS participation in Washington and Oregon[, and] Jim Wades will be our team leader for on-site planning, preparation, and operations." Compl., Ex. G 2 (emphasis in original).

8-9. For Ames, the fact that ARRL's leadership did not object at every turn means it tacitly endorsed his conduct. *Id*. at 14; *see also* Compl. ¶ 35-36 ("whatever alleged rules and regulations there were for communications between ARRL and FEMA . . . they were not enforced."); *id*. ¶ 46 (the Memorandum of Agreement between ARRL and FEMA was also "waived and/or not enforced"). The plaintiff further alleges that, a few days after Sumner sent the August 2015 letter, he received an ARRL certificate, signed by Craigie, authorizing him to "nominate other deserving qualified radio amateurs for membership" in the ARRL A-1 Operator Club. Pl.'s Br. 8-9. According to Ames, the "certificate suggests that ARRL was satisfied with [his] work while knowing that [he] had ongoing communications with Chris Turner of FEMA." *Id*. at 9. The plaintiff also seems to imply that his unanimous re-election as section manager on April 1, 2016, is another indication of his satisfactory performance. *Id*. at 9. Lastly, the plaintiff argues he never made any commitments to FEMA representatives, but merely apprised them of "NTS's ability to receive and relay messages." Pl.'s Br. 6-7, 14.[5]

        The plaintiff cites no case law in support of these arguments, which in any event are beside the point because none of them are factually supported by the pleadings even when viewed in the light most favorable to him. Ames' contention that he was merely "relaying" information to FEMA about NTS' abilities is far-fetched. His own exhibits show that he made explicit commitments in response to FEMA's requests for assistance with specific initiatives, such as the Cascadia Rising exercise. Ames' claim that the Memorandum of Agreement was "waived and/or not enforced" is contradicted by the fact that Sumner warned Ames that Corey was the only authorized point of contact between FEMA and ARRL under that agreement.

---

[5] For the sake of completeness, this Court notes that the Complaint also alleges there was an "ongoing rift between NTS and ARRL's support for NTS." Compl. ¶ 38. And that "Ames was considered the spokesman for NTS's three Area Chairmen that considered FEMA's requests." *Id*. Those allegations add nothing to plaintiff's cause of action, because NTS is alleged to be a program of ARRL not an independent entity. If anything, they reveal the plaintiff's inclination to overstep his authority.

ARRL's decision to remove Ames from his leadership positions after he disregarded Sumner's directive is further evidence of enforcement. Ames' argument that ARRL personnel knew of and approved his conduct is also controverted by the pleadings. Sumner informed the plaintiff that his communications with FEMA were unauthorized and violated ARRL policy and that Corey was the only authorized "point of contact" with FEMA. Nothing in the Complaint or accompanying exhibits indicates that any of Ames' communications with FEMA were authorized by policy or approved by the appropriate ARRL representative before or after they happened. Sumner's and Corey's e-mails thanking Ames for informing them of his communications with FEMA are not properly understood as endorsements of his conduct, especially since those contacts occurred after Ames had been directed to cease communications with FEMA representatives unless authorized by Craigie. And the certificate signed by Craigie does not explicitly or implicitly authorize Ames' communications with FEMA; it simply acknowledges his membership in the ARRL A-1 Operator Club and his right to nominate other radio amateurs for membership. Ames' re-election is equally irrelevant because it says nothing about the falsity of the contested statements.

In sum, notwithstanding any allegations to the contrary, the plaintiff's pleadings show unambiguously that all three contested statements are true and, therefore, cannot form the basis of a defamation claim against any of the Defendants as a matter of law.[6]

[6] This Court does not address Defendants' other arguments because it is satisfied that the plaintiff cannot show that the allegedly defamatory statements are false. *See Tucker v. Fischbein*, No. CIV. A. 97-6150, 1999 WL 124355, at *6 (E.D. Pa. Feb. 9, 1999) (withholding judgment on defendants' other arguments because the court was "convinced" the alleged comments were not capable of defamatory meaning), *aff'd in part, rev'd in part*, 237 F.3d 275, 287-88 (3d Cir. 2001) (noting, without disapproval, the district court's decision to forego commenting on all of the defendant's arguments).

**CONCLUSION**

Because the plaintiff not only failed to adequately allege that the defamatory statements are false but instead produced and referenced documents that show that they are true, Defendants' Motion is granted. The Complaint is dismissed in its entirety with prejudice. *See Morrison*, 2016 WL 4701460, at *4 (dismissing with prejudice because the plaintiff's complaint "makes clear the truth of the defamatory statements"). An appropriate Order follows.

BY THE COURT:

*/s/ C. Darnell Jones, II*
C. Darnell Jones, II J.